# David H. Conyngham, devisee of John M. Nesbitt *against* the Commonwealth.

Inquisition on a claim against the state, upon an eviction of lands sold by the agents of forfeited estates under the act of 6th March 1778, confirmed, though no possession had been delivered by the council, and the purchaser had failed in an ejectment commenced against an adverse claimant, by title paramount.

MAJOR HARRY GORDON, of the British army, was attainted of high treason, under the name of Henry Gordon, by a proclamation of the Supreme Executive Council, dated 20th March 1781, requiring him to surrender himself for trial by the 1st November following, founded on the law of 6th March 1778. 1 St. Laws 750.

*Major Gordon was entitled by patent, dated 17th May [*472 1774, to 1497 acres of land in Frankstown township, in Bedford county, which were afterwards in 1782 sold by the

[Conyngham *v.* Rempublicam.]

agents of forfeited estates to James Woods, and on the 18th April 1782 they received 2005l., the consideration thereof. Between the times of signing the preliminary articles of peace between the United States and Great Britain, on the 30th November, 1782, and the definitive treaty of 3d September 1783, to wit, on the 31st January 1783, an act of assembly passed to cure the misnomer of Gordon, who was called on to surrender himself by the name of Henry instead of Harry. 2 St. Laws 87.

On the 2d October 1783, the Supreme Executive Council, by their president, conveyed by patent the 1497 acres to James Woods, who on the same day conveyed the premises to John Maxwell Nesbitt, who afterwards, by will, devised the same to the aforesaid David H. Conyngham.

On the 26th October 1774, the agent of major Gordon leased the lands to Peter Titus. He was intermarried with the sister of James Karr, who was brought up by him and lived with him as an inmate. They had separate stocks afterwards, but Titus managed the farm.

Nesbitt commenced an ejectment against Peter Titus and James Karr to April term 1789, in Huntingdon county; and pending the suit, Karr intermarried with the daughter of James Ranken, who claimed 300 acres of the land sold by the agents, under a warrant of 3d February 1755, under which no survey had been made, but which was seven years older than the warrant under which the land was first surveyed. The ejectment first came on to trial on the 4th May 1793, before M'Kean, late Chief Justice, and YEATES, when a verdict passed for the defendants, against the charge of the court, and the court in bank awarded a new trial, without costs.

It was tried a second time at Nisi Prius, on the 16th May 1797, before SHIPPEN and SMITH, Justices, and a verdict given for the defendants, against the charge of the court, on which a second new trial was ordered in bank, without costs.

It was finally tried at the last Circuit Court at Huntingdon, on the 16th May 1802, before YEATES and BRACKENRIDGE, Justices, who differing in their opinions on the title, a verdict and judgment was rendered for the defendants.

Conyngham, as devisee of Nesbitt, having filed a claim against the commonwealth, under the 9th section of the act of 24th March 1779, (1 St. Laws 793) for the value of 282¾ acres and allowance, of which he supposed Nesbitt had been evicted or dispossessed by the above judgment, an inquest was awarded by *473] *the court to ascertain the same, and the inquisition, under the hands and seals of the sheriff and jurors, was now returned, valuing the same at 2179l. 10s. 7d.

Mr. M'Kean, attorney general, in behalf of the state, objected to the confirmation of the inquisition on two grounds.

1st. It is directed by the law of 6th March 1778, § 12, that the president or vice president in council shall cause the posses-

[Conyngham *v.* Rempublicam.]

sion of the lands and interests, sold by the agents of forfeited estates, to be delivered to the buyers or their assigns.    But here no requisition has been made to the council or executive authority, by Woods or those claiming under him, for this purpose. And there are many cases wherein one may defend a possession in ejectment, and yet not be entitled to recover as plaintiff.

2d.  The provision in the 9th section of the act of 29th March 1779 respects only the case of purchasers of the estates of any convicted or attainted traitor, evicted or dispossessed by judgment under a title paramount, in an ejectment against such purchaser, his heirs or assigns, or his or their tenants, within twenty years after sale, &c.    Now here no suit was brought against Nesbitt, but he was himself the lessor of the plaintiff.

Besides, though the purchaser is to be paid the value of the estate at the time of the eviction, yet he can have no claim to improvements made by the adverse party ; and moreover, he should make a re-conveyance of the lands of which he has been evicted, before he obtains the decree of this court, for the value thereof, to be paid out of the treasury of this commonwealth.

He concluded that the legislature only were competent to grant relief in the present instance.

Mr. Ingersoll, for the claimant, answered, that circumstanced as this case is, it would have been idle to have called on the executive to give possession to the purchaser, when it was known that Titus, the tenant of Gordon, lived on the lands at the time of the sale.    It could not be known that he would basely have surrendered up the possession to the adverse claimant, until a variety of unsuccessful efforts had been made to obtain possession ; and finally, the vendee of the purchaser was compelled to bring his ejectment.

But I am willing to take up the first objection as an abstract legal question, detached from other facts.    When it is said in the act of 6th March 1778, that the council should give possession of the lands sold, it must be understood, that there must not be an adverse possession at the time.    It could not mean that the vendee should be put in by force, and with the *posse comitatus.*    *One instance indeed presents itself of such [*474 an attempt.    It was in the case of Hog Island, sold as the property of Joseph Galloway to Thomas Barclay ; but gen. Thomas Proctor, the adverse claimant, had a field piece drawn to the spot, and resisted the force.    The agents of the Supreme Executive Council were thus foiled ; but they would certainly have persisted, if it had been thought by government that such violent measures had been justifiable.    The construction I contend for is analogous to that put on the law of 1705, "for taking "lands in execution for payment of debts."   1 St. Laws 67. There strong words are used by the legislature, of delivering over the lands of the debtor to the purchaser by the sheriff ; but the construction always has prevailed, that in case of an

adverse possession, the purchaser is put to his ejectment.    Many counsel have thought, that if it had been *res integra*, and the debtor had continued in possession, the sheriff might have dispossessed him, but not a third person, in favour of the purchaser, as on a *fieri facias* in England, in the case of a term levied on ; (Per Buller. 3 Term Rep. 298) but a different interpretation having generally prevailed, the legislature found it necessary to pass a law on the subject on the 6th April 1802, " enabling pur- " chasers at sheriff's or coroner's sales to obtain possession." 5 St. Laws 266.

But if the legislature had even intended to have given the council this power of taking possession by force, and had thus infringed the sacred right of a citizen to a trial by jury, the law would have been unconstitutional and void, according to the opinion of this court, delivered by YEATES, J. in the case of Austin's lessee *v.* Baker, on the act of the 6th August 1784, and which was afterwards repealed on the 18th February 1785. All that the legislature could do in such a case would be, to empower the council to transfer the legal interest of the traitor to the purchaser, and to deliver to him the possession, if vacant ; but if the possession was withheld by another, the right thereto must necessarily be subject to judicial decision.

2d objection.    It is true, that the literal expressions of the law of 29th March 1779, respect ejectments brought against the purchasers, their heirs or assigns ; but the spirit and equity of the act reaches to cases, wherein they have brought suits against adverse claimants.    The legislature intended to indemnify such purchasers against persons claiming lands by title paramount to the traitors ; and in this view, it can be of no moment who commences the action, provided it be done within 20 years after the sale by the agents.    I have attempted to shew, that the buyers are not entitled to be put into possession by force, and they have no alternative except bringing a suit at law.    If *475]    *they had, after paying their money into the coffers of the state, represented to council that their contract should be rescinded, and the money repaid to them, on account of their inability to deliver the possession, they would naturally have received for answer, that the merits of the contending titles must be tried at law before such a measure could be adopted. It cannot be said that Mr. Nesbitt has been negligent or inactive in pursuing his right.    Thirteen years has he waged a legal warfare against the obstinate prejudices of a whole county, though to him the uniform result has been expence and vexation.    The words are in the disjunctive, evicted *or* dispossessed.

As to the improvements, they have been but trifling ; they were made by the tenants of Gordon, and those who originally came into possession under them ; and if Nesbitt's title had been sanctified by a recovery, he would have been entitled to all the improvements on the lands in controversy.    The words of the

[Philadelphia, Mayor of, &c. *v.* Nell.]

law are, "that the person evicted, his heirs or assigns, shall be "paid the value of such estate at the time of eviction."

There will be no difficulty as to the re-conveyance to the state if the court shall deem it necessary ; but it should be given at the time the money is paid.

The court declared, that there should be a re-conveyance made to the commonwealth of the 282¾ acres, and were unanimously of opinion in favour of the plaintiff on both points.

Inquisition confirmed.